## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

(1) M. LEE ARNOLD, Derivatively on )
Behalf of, CHESAPEAKE ENERGY )
CORPORATION, )
)
                  Plaintiff, )
)
vs. )
)    Case No. CIV-11-985-L
)
(1) AUBREY K. MCCLENDON, )
(2) RICHARD K. DAVIDSON, )
(3) V. BURNS HARGIS, )
(4) FRANK KEATING, )
(5) BREENE M. KERR, )
(6) CHARLES T. MAXWELL )
(7) DON NICKLES, )
(8) FREDERICK B. WHITTEMORE, and )
(9) MERRILL A. MILLER, JR., )
)
             Defendants, )
)
          and )
)
(10) CHESAPEAKE ENERGY )
CORPORATION, an Oklahoma )
corporation, )
)
      Nominal Defendant. )
_____

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
## FOR BREACH OF FIDUCIARY DUTIES, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

Plaintiff M. Lee Arnold ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of nominal defendant Chesapeake Energy Corporation ("Chesapeake" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy the defendants' misconduct from

January 1, 2008 to the present (the "Relevant Period"). Plaintiff makes the following allegations based upon individual and personal knowledge as to his own acts, and the investigation undertaken by his undersigned counsel as to other matters, which investigation included, inter alia, an analysis of U.S. Securities and Exchange Commission ("SEC") filings by Chesapeake, as well as securities analysts' reports and advisories about the Company, press releases, and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Chesapeake's business is the exploration for and production of natural gas. The Company is North America's third largest producer of natural gas. It owns interests in nearly 40,000 natural gas and oil-producing wells that are currently producing more than 2 billion cubic feet equivalent per day. Chesapeake's strategy is to discover, acquire, and develop conventional and unconventional natural gas reserves.

2.     Defendant Aubrey K. McClendon ("McClendon") has served as Chesapeake's Chief Executive Officer ("CEO") and Chairman of the Board since he co-founded the Company in 1989.

3.     Since the Company's initial public offering ("IPO") in 1993, defendant McClendon has participated in a "well participation program," available only to the Company's founders, whereby he is permitted to participate in all of the Company's wells. The stated purpose of the program, as presented to shareholders when Chesapeake was seeking approval, is to retain and motivate the founders and align their interests with the Company's interests. The program was extremely beneficial to McClendon, as evidenced by, among other things, the fact that he owns producing gas reserves with an estimated

net present value of $191 million and that he invested in almost every single one of the Company's wells since the IPO.

4.      Defendant McClendon also is and has long been the largest Chesapeake shareholder. McClendon historically touted the fact that he had never sold any of his Chesapeake shares, which led the public to believe that McClendon felt confident about the Company's future prospects. However, by 2008, McClendon had put almost all of his Chesapeake shares up as collateral for various credit arrangements.

5.      In 2008, Chesapeake performed abysmally. It was named the worst-performing oil and gas producer in the Standard & Poor's ("S&P") 500 for 2008. Chesapeake's value dropped so far that, on October 8, 9, and 10, 2008, defendant McClendon received margin calls requiring him to liquidate 94% of his Chesapeake stock (which also jeopardized his ability to participate in the well participation program). In the few days prior to Chesapeake's October 10, 2008 announcement of the margin calls, three Chesapeake directors sold their personally held shares of Company stock for more than $5.2 million in proceeds.

6.      Defendant McClendon's fiduciary duties, and his employment agreements, require him to use his best efforts and due diligence to assist the Company in achieving the most profitable business consistent with a quality operation. McClendon failed to fulfill these duties in 2008 and, as reported by *The Financial Times*, received the lowest ranking among CEOs of energy companies in terms of the value provided to shareholders in that year. These failures were reflected in Chesapeake's 2008 performance.

7.      Nonetheless, the Board approved, upon the recommendation of defendant McClendon himself, an amended employment agreement that paid McClendon a total of $124 million in 2008. This compensation package included a $77 million bonus, $75 million of which was a "well cost incentive award" structured as a net credit against future billings from the Company for costs owed by McClendon under the well program. The compensation also included a payment from Chesapeake to McClendon in the

amount of $12.1 million for the purchase of McClendon's personal collection of "antique maps."

8.      The compensation paid to defendant McClendon in 2008 was not based on his performance or the performance of the Company under his watch. Rather, the $124 million compensation package represents an effort by the Board to bail McClendon out of the financially precarious situation in which he placed himself. There was no provision in the well participation program for fronting McClendon's costs, but the Board nonetheless approved the $75 million incentive award that did just that to ensure that McClendon could continue to participate in the program and save him from the mess he had created. Neither was the $12.1 million for McClendon's personal maps based on McClendon's performance or for the Company's benefit—the map collection had already been on display at the Company's headquarters for years and would have remained there. Chesapeake received no benefit from the Board showering McClendon with millions more in compensation.

9.      The excessiveness of defendant McClendon's compensation becomes even clearer when compared to his own compensation in prior years, the compensation of fellow Chesapeake executives in 2008, and the compensation of other CEOs of similar companies in 2008. Indeed, McClendon's total 2008 compensation package made him the highest paid CEO of all S&P 500 companies, when he had never previously made more than $20 million in a single year.

10.     The members of the Board, and the members of the Board's compensation committee ("Compensation Committee") and audit committee ("Audit Committee") in particular, breached their fiduciary duties in connection with the approval of defendant McClendon's 2008 compensation package. The Compensation Committee spent only a single day, and did not consult any independent consultants, in considering and deciding to approve the new employment agreement despite the fact that it paid McClendon more than $124 million in a year in which Chesapeake and McClendon himself were ranked at

the bottom of their respective lists performance-wise. The Audit Committee members breached their fiduciary duties as well by relying solely on McClendon's own art agent to value his personal collection of maps and not seeking any independent appraisal. The Compensation Committee did not even discuss the Audit Committee's recommendation.

11.     In light of these facts and the facts alleged below, Plaintiff, on behalf of Chesapeake, respectfully requests that the Court order rescission of defendant McClendon's amended employment agreement (including the $77 million bonus and the $12.1 million purchase of maps from McClendon), order disgorgement of the insider trading profits alleged herein, and grant the other relief requested in this Complaint.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a). The acts and transactions that gave rise to the violations of law asserted in this complaint occurred in this District. The misconduct complained of herein occurred in substantial part in this District, including the preparation and dissemination of materially false and misleading statements and the omission of material information complained of herein.

## THE PARTIES

14.     Plaintiff is a current shareholder of Chesapeake and has continuously held Chesapeake stock at all relevant times throughout the Relevant Period. Plaintiff is a citizen of Missouri.

15.     Nominal defendant Chesapeake is an Oklahoma corporation headquartered in Oklahoma City, Oklahoma. The Company's principal executive offices are located at

6100 North Western Avenue, Oklahoma City, Oklahoma. Chesapeake's shares trade on the New York Stock Exchange.

16.     Defendant McClendon has served as Chairman of the Board and CEO of the Company since 1989, when he co-founded the Company. Defendant McClendon is a citizen of Oklahoma.

17.     Defendant Richard K. Davidson ("Davidson") has served as a director of the Company since 2006. In addition, defendant Davidson served as a member of the Board's Audit Committee during the Relevant Period. Defendant Davidson is a citizen of Florida.

18.     Defendant V. Burns Hargis ("Hargis") has served as a director of the Company since September 2008. In addition, defendant Hargis served as a member of the Audit Committee during the Relevant Period. Defendant Hargis is a citizen of Oklahoma.

19.     Defendant Frank Keating ("Keating") has served as a director of the Company since 2003. In addition, defendant Keating served as a member of the Compensation Committee during the Relevant Period. Defendant Keating is a citizen of Virginia.

20.     Defendant Breene M. Kerr ("Kerr") served as a director of the Company from 1993 until June 12, 2009. In addition, defendant Kerr served as Chairman of the Audit Committee during the Relevant Period. Defendant Kerr is a citizen of Maine.

21.     Defendant Charles T. Maxwell ("Maxwell") has served as a director of the Company since 2002. In addition, defendant Maxwell served as a member of the Compensation Committee during the Relevant Period. On October 9, 2008, defendant Maxwell sold 2,000 shares of Chesapeake stock for proceeds of $34,455.50. Defendant Maxwell is a citizen of New York.

22.     Defendant Don Nickles ("Nickles") has served as a director of the Company since 2005. Between October 8 and 9, 2008, defendant Nickles sold 9,375

shares of Chesapeake stock for proceeds of $211,948.75.  Defendant Nickles is a citizen of Virginia.

23.     Defendant Frederick B. Whittemore ("Whittemore") has served as a director of the Company since 1993.  In addition, defendant Whittemore served as a member of the Compensation Committee during the Relevant Period.  On October 6, 2008, Whittemore sold 200,000 shares of Chesapeake stock for proceeds of $5,017,660. Defendant Whittemore is a citizen of New York.

24.     Defendant Merrill A. Miller, Jr. ("Miller") has served as a director of the Company since 2007.  In addition, defendant Miller served as a member of the Audit Committee during the Relevant Period.  Defendant Miller is a citizen of Texas.

25.     Collectively, defendants McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, and Miller are referred to herein as the "Individual Defendants."

26.     Collectively, defendants McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, and Miller are referred to herein as the "Director Defendants."

27.     Collectively, defendants Maxwell, Keating, and Whittemore are referred to herein as the "Compensation Committee Defendants."

28.     Collectively, defendants Davidson, Hargis, Kerr, and Miller are referred to herein as the "Audit Committee Defendants."

29.     Collectively, defendants Whittemore, Nickles, and Maxwell are referred to herein as the "Insider Selling Defendants."

## THE INDIVIDUAL DEFENDANTS' DUTIES

30.     By reason of their positions as officers, directors, and fiduciaries of Chesapeake and because of their ability to control the business and corporate affairs of Chesapeake, the Individual Defendants owed and owe Chesapeake fiduciary obligations

of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Chesapeake in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Chesapeake and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Chesapeake and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

31.     The directors also have a duty to inform themselves of all material information reasonably available to them prior to making a business decision. Upon receipt of a litigation demand, the directors must investigate and evaluate the charges in order to discharge their duty to the shareholders and the Company. The directors must review all information necessary to objectively and meaningfully evaluate the demand.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Chesapeake, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Chesapeake, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.

33.     To discharge their duties, the officers and directors of Chesapeake were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Chesapeake were required to, among other things: (a) exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner and provide the highest quality of performance; (b) exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, and regulations, and all contractual

obligations, including acting only within the scope of its legal authority; (c) ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; (d) ensure that the purposes and goals of the Company's well participation program are served at all times and are not compromised in order to serve the interests of any of Chesapeake's executive officers; (e) ensure that compensation is paid to the Company's executives and other employees in accordance with the Company's Compensation Committee Charter, or other relevant corporate guidelines; (f) ensure that the Company not waste its corporate assets by conferring personal benefits on its executives or other employees, with no corresponding benefit to the Company; (g) ensure that the Board and any of its committees, including the Compensation Committee and Audit Committee, fulfill their respective duties, including by ensuring that the Board and its committees become reasonably informed before making any decisions on the Company's behalf; and (h) ensure that no Chesapeake director, officer, or other employee sells shares of Chesapeake stock with knowledge of and on the basis of non-public information.

34.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Chesapeake, the absence of good faith on their part, and a disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The Individual Defendants breached their duties of loyalty, care, and good faith by allowing defendants to cause, or by themselves causing, the wrongdoing alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Defendant McClendon's History as Chesapeake's Chairman and CEO

35.    Defendant McClendon is Chesapeake's Chairman and CEO, and has been since he co-founded the Company in 1989.

36.   Per his employment agreements with Chesapeake, defendant McClendon had the duty to, inter alia, use his best efforts and due diligence to assist the Company in the objective of achieving the most profitable operation of the Company consistent with developing and maintaining a quality business operation.

37.   Between 2002 and 2007, defendant McClendon made the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Underlying Options (#) | All Other Comp | Total Comp |
|---|---|---|---|---|---|---|---|
| 2007 | $975,000 | $1,826,000 | $14,398,233 | $294,020 | - | $1,271,231 | $18,764,484 |
| 2006 | $975,000 | $1,581,000 | $9,288,550 | $1,412,612 | - | $1,819,698 | $15,076,860 |
| 2005 | $925,000 | $1,326,000 | $14,364,800 | - | - | $1,339,300 | $17,955,100 |
| 2004 | $840,000 | $1,127,500 | $8,045,000 | - | - | $921,649 | $10,934,149 |
| 2003 | $737,500 | $877,500 | - | - | 1,375,000 | $452,594 | $2,067,594 |
| 2002 | $650,000 | $686,000 | - | - | 860,000 | $245,659 | $1,581,659 |

38.   As a co-founder of Chesapeake, defendant McClendon is also permitted to participate in the Company's Founders Well Participation Program ("FWPP"). The FWPP was a continuation of a well participation program that was initiated with Chesapeake's IPO in 1993 for its two founders, including defendant McClendon. While the FWPP was not approved by shareholders until June 10, 2005, through previous employment agreements, McClendon has been retaining a significant interest in the Company's drilling activities and wells since the Company's IPO.

39.   The FWPP permits defendant McClendon to participate in all of the wells drilled by or on behalf of Chesapeake during each fiscal year. A participation election may not exceed a 2.5% working interest in a well and is not effective for any well where the Company's working interest (after elections by the founders to participate) would be reduced to below 12.5%. For each well in which defendant McClendon participates, the Company will bill him, on a monthly basis, an amount equal to his participation percentage multiplied by the costs incurred in drilling the well.[1]

---

[1] The terms of the FWPP are essentially the same as the prior well participation program.

40.     Per Chesapeake's April 29, 2005 Proxy Statement, the purpose of the FWPP is to foster and promote the development and execution of the Company's business by: (i) retaining and motivating the principal executive officers who founded the Company; (ii) aligning the financial rewards and risks of the founders with the Company more effectively than overriding royalty, carried interest or other performance incentive programs maintained by many of the Company's peers; and (iii) imposing on the founders the same risk incurred by the Company in its core operations.

41.     To encourage shareholders to vote to approve the FWPP, the Company presented the program's benefits as follows:

- Since the long-term success of the Company is dependent on its ability to conduct oil and gas exploration and production profitability, the participation program instills discipline in the Company's long-term strategy by imposing risks on the Founders which are identical to the risks incurred by the Company.

- The Company's stock price fluctuates based on many industry-related factors that are not within the control of our management, including volatility of oil and gas prices and global supply/demand trends for natural resources. The participation program provides an additional mechanism for providing direct incentives to the Founders to create long-term value through the efficient development of the Company's resource base.

- Our founders are personally and professionally incentivized to maintain their focus on the growth, success, and profitability of the Company's operations since such operations have a direct impact on the Founders.

42.     The FWPP and the similar participation program before they were so beneficial to defendant McClendon that he has elected to invest in every Chesapeake well since the Company's IPO in February 1993 (with the exception of the brief period between January 1, 1999 to March 31, 2000). As Mitchell Schnurman of the *Star-Telegram* stated in an article entitled "Chesapeake CEO is a Winner Either Way" (April 25, 2009), "[g]iving McClendon a share of gas revenue is akin to giving Steve Jobs a

share of iPod sales or giving Michael Dell a percentage of computer shipments." According to Chesapeake's April 20, 2009 Proxy Statement, McClendon owned producing gas reserves with an estimated net present value of approximately $191 million.

### Defendant McClendon's History of Ownership of Chesapeake Stock

43.    In addition to serving as Chesapeake's Chairman and CEO, defendant McClendon is, and was during the Relevant Period, Chesapeake's largest individual shareholder.    Per a July 15, 2008 Form 4, McClendon owned 33,469,359 shares of Chesapeake stock on July 15, 2008.[2]    The following chart shows the history of McClendon's Chesapeake stock ownership:

---

[2] Defendant McClendon's employment agreements contained a requirement that he hold shares of Chesapeake stock worth greater than 500% of the total of his annual base salary and bonus.



44. Prior to and throughout the early part of the Relevant Period, defendant McClendon publicly touted that he had never sold any of his Chesapeake common stock. This, of course, signaled to the public that McClendon was confident in the future success of the Company. In reality, however, McClendon's stake and confidence in Chesapeake's business prospects were not as substantial as advertised: nearly all of his Chesapeake holdings were collateralized. Defendant McClendon put up his Chesapeake common stock as collateral for his credit arrangements with RBC Dain Rauscher, Inc., Lehman Brothers, Wachovia Securities, Morgan Stanley, and Goldman, Sachs & Co. According to the Company's 2008 Proxy Statement, as of April 14, 2008, McClendon had pledged 29,332,493 of his 29,529,975, or 99%, of his shares of Chesapeake common stock.

### McClendon and Chesapeake's Dreadful 2008 Performance Leads to Margin Calls for McClendon and the Forced Sale of 94% of His Chesapeake Stock

45. The year 2008 was rough for Chesapeake by any measure. Earnings per share in 2008 fell to $1.16 compared to $2.69 in 2007, and the Company's earnings per share growth rate for year-end 2008 (-56.4%) was significantly worse than the preceding two years: 2007 (-39.85%) and 2006 (73.55%). The Company's net income for 2008 was only $723 million, compared to $1.45 billion recorded in 2007, and $2 billion in

2006. *Bloomberg.com* dubbed Chesapeake the worst-performing oil and gas producer in the S&P 500 for the year 2008. The Company lost $860 million in the 4Q:08, compared with a $303 million profit for the same period in 2007. The Company's stock fell from $74 per share in July 2008 to less than $10 per share in December 2008. By way of comparison, Chesapeake performed worse in 2008 than other large independent energy companies, including Devon Energy Corporation ("Devon"), Anadarko Petroleum Corporation ("Anadarko") and XTO Energy Inc.

46.     The Company's poor financial performance put enormous strain on its cash flow. To raise cash, the Company issued 23 million shares and sold more than $1 billion in senior notes in the spring of 2008, put forth a stock offering of 28.75 million shares on July 15, 2008, and later, in the fall of 2008, announced a plan to sell 50 million additional shares, which caused Chesapeake's stock price to immediately drop by 40% on concerns that the Company's stock was being severely diluted. The Company later canceled most of the latter offering due to the market's strong negative reaction. CEO defendant McClendon personally apologized to analysts and investors during a conference call in November 2008, for inadvertently causing the Company's stock price to drop because of dilution concerns. The lack of operating cash led the Company to sell off many of its key assets. In 2008, the Company sold off more than $11 billion worth of assets, which represented approximately one-third of the total assets owned by the Company. Some of these sales were completed at prices that were disadvantageous to Chesapeake and reflected the Company's need for immediate infusions of cash. Defendant McClendon stated that one transaction with Statoil occurred at prices that were very favorable to the foreign energy conglomerate.

47.     Chesapeake struggled for cash when the price of natural gas reached unprecedented highs in the summer of 2008. The Company routinely withdrew all of its $3.5 billion revolving credit facility. The proceeds from the stock offering were intended to be used to temporarily pay down the revolving credit facility.

48.     Chesapeake's ongoing cash flow concerns caught the attention of the SEC. In a letter dated May 30, 2008, the SEC requested additional disclosures regarding the Company's negative cash flow and liquidity problems. The Company responded by stating, in effect, that it planned to sell significant assets to raise new working capital and to temporarily resolve their cash problems.

49.     Defendant McClendon stated in a conference call in the last quarter of 2008 that concerns over whether the Company had sufficient operating capital caused the Company's stock to trade at a significantly reduced level. Several analysts who track Chesapeake have confirmed his statement. An analyst report published by JP Morgan on November 28, 2008, stated that Chesapeake is the "riskiest of the large cap group because of the corporate strategy and operating and financial leverage." Others have indicated that Chesapeake trades at reduced multiples because of its liquidity concerns.

50.     The selling of senior notes continued at a rapid pace in 2009, raising nearly $1.5 billion to repay "outstanding indebtedness." Recently, the Company's capital needs forced it to enter into a joint venture with Total S.A., a French energy concern, for sale of 25% of Chesapeake for $800 million in cash and $1.45 billion to fund 60% of the Company's drilling and completion operations.

51.     As Chesapeake's stock value plummeted, defendant McClendon faced margin calls requiring him to unload nearly all of his Chesapeake stock. Specifically, on October 8, 9, and 10, 2008, McClendon received three consecutive margin loan calls, forcing him to sell 94% of his Chesapeake stock for proceeds of over $569 million. Chesapeake announced this on October 10, 2008, informing the public that McClendon had "involuntarily sold substantially all of his shares of Chesapeake common stock over the past three days in order to meet margin loan calls." Specifically, over those three days, McClendon sold 31,522,923 shares of Chesapeake's common stock, and was left with 1,947,959 shares on October 10, 2008.

52.     Just days prior to the October disclosure, defendants Whittemore, Nickles, and Maxwell sold over $5.2 million worth of Chesapeake stock with knowledge of McClendon's impending margin calls.

## Notwithstanding Chesapeake's 2008 Performance, the Board Rewarded McClendon with a $124 Million Compensation Package that Included, Among Other Things, a $75 Million Bonus

53.     Despite the Company's putrid performance in 2008, the Company rewarded defendant McClendon with a lavish compensation package, granting him a new five-year employment contract that made him one of, if not, the highest paid CEOs in the country.

54.     As a preliminary matter, this was an odd time to enter into a new employment agreement with defendant McClendon. Just one year earlier, in December 2007, Chesapeake had entered into a new five-year employment agreement with McClendon that provided for, among other things: (a) an annual base salary of at least $975,000; (b) bonuses at the discretion of the Compensation Committee; (c) eligibility for equity awards under the Company's stock compensation plans; and (d) unlimited use of the Company aircraft.

55.     The new employment agreement announced on January 7, 2009, in addition to $975 million in salary for defendant McClendon, provided for total 2008 "bonus" compensation of $76,950,000. This nearly $77 million bonus consisted of a semi-annual cash bonus of $1.95 million and a one-time $75 million "well cost incentive award." The $75 million award was structured as a net credit against future billings from the Company for well costs owed by McClendon under the FWPP. The incentive award was set forth as an after-tax credit of $43.5 million toward McClendon's costs in the FWPP (which may be paid in cash to McClendon at year-end 2014 if not fully utilized).

56.     Further, the amended employment agreement provided for the payment of $12.1 million from Chesapeake to defendant McClendon based on the sale of

McClendon's personal "extensive collection of historical maps of the American Southwest" to Chesapeake in December 2008 (which was approved by the Board).

57.    In sum, in a year in which Chesapeake struggled mightily, the Board approved a compensation package to defendant McClendon totaling $124.6 million. Per the Company's Proxy Statement filed in April 2009, defendant McClendon's 2008 compensation was as follows: (i) $975,000 in salary; (ii) $76,950,000 in bonus, $75 million of which was in the form of a "well incentive award"; (iii) $32,737,700 in stock awards[3]; (iv) $12,395,316 in stock option grants that had not yet vested; (v) $12.1 million from the sale of McClendon's personal maps to Chesapeake in December 2008, which was approved by the Board; and (vi) $1,800,817 in other compensation.

58.    For the reasons discussed below, the Board's approval of this excessive compensation package to defendant McClendon represents a breach of fiduciary duties and an utter waste of Chesapeake's corporate assets.

### McClendon's $124 Million Compensation Package Was Designed to Bail McClendon Out and Bore No Relation to Chesapeake's 2008 Performance

59.    The Board's hasty approval of a $124 million compensation package, which included a $75 million bonus incentive award, was wholly unwarranted in light of the Company's abysmal 2008 performance. The Board's actions do not reflect any sort of evaluation of the job defendant McClendon did in 2008, but rather represent an attempt to bail McClendon out from his self-inflicted situation.

60.    As detailed above, Chesapeake performed much worse in 2008 than in either of the prior two years. The Company was labeled the worst-performing oil and gas producer in the S&P 500 in 2008, and defendant McClendon played no small part in the Company attaining that infamous distinction.    Indeed, the *Financial Times*, in a

---

[3] This value of the stock awards is based on the fair market value of the Company's stock price on the date of the grant, and the $32 million in stock awards is reported in the "Grants of Plan-Based Awards Table" in Chesapeake's 2009 Proxy Statement. However, the Company only reported $20,342,384 of this as compensation for McClendon in 2008.

November 29, 2009 article, entitled "Oil and Gas Chiefs Win Bonuses Despite Missing Targets," noted that McClendon received the lowest ranking among CEOs of energy companies in terms of the value provided to shareholders in 2008. The ranking examined return on equity, shareholder returns, and compensation.

61.    Yet, despite all of this, defendant McClendon's compensation in 2008 increased exponentially.    McClendon made approximately $19 million in total compensation in 2007, and $15 million in 2006.  He made a total of $124 million in 2008—more than six times his 2007 compensation.  His $77 million bonus in 2008 also dwarfs the less than $2 million bonuses he received in 2007 and 2006—years in which Chesapeake was much more successful.   The following chart shows McClendon's compensation in the years 2006-2008:

| Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total Compensation |
|------|--------|-------|--------------|---------------|------------------------|--------------------|
| 2008 | $975,000 | $76,951,000 | $20,342,384 | — | $1,800,817 | $100,069,201 |
| 2007 | $975,000 | $1,826,000 | $14,398,233 | $294,020 | $1,271,231 | $18,764,484 |
| 2006 | $975,000 | $1,581,000 | $9,288,550 | $1,412,612 | $1,819,698 | $15,076,860 |

62.    Neither the FWPP nor any employment agreement contained any provisions stating that Chesapeake would or could front well costs to defendant McClendon.  Yet, the Board approved a $75 million "well incentive award" after the forced sale of 94% of McClendon's Chesapeake stock endangered his participation in the FWPP.  The incentive award helped to secure McClendon's participation in the FWPP and his ability to receive future returns from the program.  The Board effectively granted McClendon an outlandish bonus to bail him out of the mess in which he had placed himself and Chesapeake through his failures as the Company's CEO.

63.    As noted above, the goals of the FWPP, as pitched to shareholders in seeking their approval of the program, included motivating defendant McClendon to serve the best interests of Chesapeake and aligning his interests with those of the

Company. Providing McClendon a $75 million bonus in a year in which he led the Company to new lows furthers neither of those objectives.

64. As additional evidence that the Board's compensation plan for McClendon has little to do with performance, the amended employment plan has capped McClendon's salary and bonus at 2008 levels – $975,000 and $1.95 million respectively – until year-end 2013, regardless of how well the Company does.

65. The use of the FWPP as the structure for defendant McClendon's compensation is also troubling. As noted above, McClendon owned producing gas reserves with an estimated net present value of approximately $191 million. Yet, while the $75 million incentive award was to be applied to McClendon's well costs associated with the FWPP, those funds were quickly exhausted: as of March 31, 2009, the $75 million bonus was fully applied against McClendon's outstanding obligations under the FWPP.

66. Finally, in addition to the $75 million bonus relating to the FWPP, the $12.1 million Chesapeake paid defendant McClendon for his collection of maps was not based on McClendon or Chesapeake's performance, but rather was designed to save McClendon from his precarious financial position and represents an utter waste of corporate assets. As discussed below, the Board, and in particular the Audit Committee, utterly failed to ensure that the Company's interests in paying a fair price were protected, instead seeking to serve the personal interests of McClendon. Indeed, the Audit Committee relied solely on McClendon's personal art agent to value the maps, and did not even seek an independent appraisal. Furthermore, at the time of the purchase, the map collection had been on display at the Company's headquarters for several years. Given that the collection will likely remain on display after the purchase, the Company is receiving no new benefit from purchasing the collection.

**An Examination of the Compensation of Fellow Chesapeake Executives and CEOs at Similar Companies Further Demonstrates the Excessiveness of McClendon's 2008 Compensation**

67.     The fact that defendant McClendon's 2008 compensation was excessive becomes even more undeniable when examined in light of the compensation paid to McClendon's fellow Chesapeake executives and CEOs at competing companies. For instance, in 2008, the next closest Chesapeake executive officer in total compensation made roughly $12 million, while the next closest bonus was only $1.3 million. These numbers pale in comparison to the money paid to McClendon. The following chart shows the compensation paid to Chesapeake's executive officers, including McClendon, from 2006-2008:

| | Year | Salary | Bonus | Stock Awards | Option Awards | All Other Comp | Total Comp |
|---|---|---|---|---|---|---|---|
| McClendon; | 2008 | $975,000 | $76,951,000 | $20,342,384 | — | $1,800,817 | $100,069,201 |
| Chairman | 2007 | $975,000 | $1,826,000 | $14,398,233 | $294,020 | $1,271,231 | $18,764,484 |
| and CEO | 2006 | $975,000 | $1,581,000 | $9,288,550 | $1,412,612 | $1,819,698 | $15,076,860 |
| Rowland; | 2008 | $844,769 | $1,331,000 | $5,976,985 | — | $1,164,406 | $9,317,160 |
| EVP - | 2007 | $787,500 | $1,201,000 | $9,371,017 | $35,200 | $941,855 | $12,336,572 |
| Finance and | | | | | | | |
| CFO | 2006 | $675,000 | $1,051,000 | $2,016,652 | $164,794 | $679,841 | $4,587,287 |
| Dixon; EVP | 2008 | $844,769 | $1,331,000 | $4,209,405 | — | $664,571 | $7,049,745 |
| Operations | 2007 | $787,500 | $1,201,000 | $2,442,059 | $21,104 | $579,431 | $5,031,094 |
| and COO | 2006 | $671,875 | $1,053,986 | $966,919 | $98,130 | $384,512 | $3,175,422 |
| Jacobson; | 2008 | $787,308 | $1,151,000 | $9,668,499 | — | $482,920 | $12,089,727 |
| EVP - | 2007 | $737,500 | $1,001,000 | $3,789,447 | $18,686 | $449,998 | $5,996,631 |
| Acquisitions | | | | | | | |
| and | | | | | | | |
| Divestitures | 2006 | $637,500 | $851,000 | $974,154 | $81,340 | $302,032 | $2,846,026 |
| Lester; EVP | 2008 | $762,365 | $1,066,250 | $5,403,174 | — | $540,954 | $7,772,743 |
| - | 2007 | $732,500 | $966,000 | $7,203,335 | $21,104 | $475,952 | $9,398,891 |
| Exploration | 2006 | $637,500 | $851,000 | $1,322,385 | $98,130 | $376,156 | $3,285,171 |

68.     Similarly, the top executive officers at similar companies did not receive anywhere near the compensation that defendant McClendon received, regardless whether those companies actually performed better than Chesapeake in 2008. For example, Devon and Anadarko both outperformed Chesapeake in 2008. Yet, their CEOs received $38 million and $21 million, respectively. In contrast here, Chesapeake paid McClendon

$124 million—$77 million in bonus alone—at the same time the Company's value was plummeting. Further illustrating the excessive nature of McClendon's compensation is the example of EOG Resources ("EOG"). EOG's profitability doubled in 2008, yet its CEO's bonus remained unchanged when compared to his 2007 bonus. The following chart shows the compensation paid to CEOs of similar companies from 2006-2008, as well as the percentage by which McClendon's compensation exceeds the average compensation of the other CEOs in each of those years:

| | 2008 Total Compensation | 2007 Total Compensation | 2006 Total Compensation |
|---|---|---|---|
| Mark G. Papa; EOG Resources | $23,439,356 | $13,036,039 | $7,966,606 |
| James T. Hackett; Anadarko Petroleum | $21,336,877 | $14,997,941 | $13,434,466 |
| Larry Nichols; Devon Energy Corp. | $38,511,112 | $12,601,153 | $12,912,845 |
| Harold M. Korell; Southwestern Energy Co. | $6,802,229 | $5,398,684 | $4,717,909 |
| Peer Average Total Compensation | $22,522,394 | $11,508,454 | $9,757,957 |
| Aubrey K. McClendon; Chesapeake Energy | $100,069,201 | $18,764,484 | $15,076,860 |
| Δ% Average CEO vs. McClendon | 344.31% | 63.05% | 54.51% |

| | | | | | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Mark G. Papa; EOG Resources Chairman and CEO | 2008 | $940,000 | $18,371,356 | $2,732,158 | $1,000,000 | $395,842 | $23,439,356 |
| | 2007 | $940,000 | $6,209,693 | $3,970,420 | $1,500,000 | $415,926 | $13,036,039 |
| | 2006 | $940,000 | $2,180,922 | $3,173,607 | $1,140,000 | $532,077 | $7,966,606 |

| | Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| James T. Hackett; Anadarko Petroleum Chairman, President and CEO | 2008 | $1,510,385 | $0 | $10,430,684 | $3,764,163 | $3,416,491 | $1,643,878 | $571,276 | $21,336,877 |
| | 2007 | $1,415,385 | $0 | $6,198,884 | $3,155,045 | $2,962,400 | $693,859 | $572,368 | $14,997,941 |
| | 2006 | $1,316,667 | $160,860 | $5,252,940 | $1,592,237 | $1,882,834 | $2,633,633 | $595,295 | $13,434,466 |

| | Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| Larry Nichols; Devon Energy Corp. Chairman and CEO | 2008 | $1,400,000 | $3,000,600 | $15,432,018 | $15,119,891 | $3,219,047 | $339,556 | $38,511,112 |
| | 2007 | $1,200,000 | $2,600,600 | $2,898,547 | $3,229,752 | $2,425,191 | $247,063 | $12,601,153 |
| | 2006 | $1,200,000 | $2,600,600 | $2,108,855 | $2,357,432 | $4,402,009 | $243,949 | $12,912,845 |

| | | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| Harold M. Korell; Southwestern Energy Co. Chairman and CEO | 2008 | $675,000 | $454,750 | $839,368 | $1,093,839 | $3,024,000 | $131,567 | $583,705 | $6,802,22 |
| | 2007 | $550,000 | $400,230 | $645,702 | $887,980 | $2,383,770 | $107,981 | $423,021 | $5,398,68 |
| | 2006 | $500,000 | $772,375 | $531,091 | $783,937 | $1,553,625 | $93,039 | $483,842 | $4,717,90 |

69.     Defendant McClendon's $124.6 million compensation in 2008 made him the country's highest-paid executive, according to CNN Money. Similarly, according to *The Associated Press*, McClendon's total compensation package for 2008 made him the highest paid CEO among S&P 500 companies. Forbes and Bloomberg also placed McClendon in the top six highest-paid CEOs of 2008. While McClendon received more than $124 million in compensation in 2008, the next nine highest-paid CEOs of S&P 500 companies received an average of $47 million. The CEO of Exxon Mobil, a much larger energy company, made $24 million in 2008.

### The Board, and Particularly the Members of the Compensation Committee and Audit Committee, Breached Their Duties in Connection with McClendon's 2008 Compensation

70.     Defendant McClendon's excessive compensation is not surprising when one considers that he determines his own compensation, subject only to "approval" by the Compensation Committee. According to the Company's proxy statements, McClendon (along with the Chief Financial Officer ("CFO") and Chief Operating Officer ("COO")) was and is responsible for "analyzing, developing and recommending base salary adjustments, cash bonuses and restricted stock awards with respect to the executive officers, including [himself], for review, discussion and approval by the Compensation Committee at its regularly scheduled meetings in June and December of each year."

71.     Pursuant to the Compensation Committee's Charter in place during the Relevant Period, its members are assigned the following responsibilities (among others):

> (a)    Review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and set the CEO's compensation level based on this evaluation;

> (b)    Review, evaluate, and approve all compensation of directors and executive officers, including salary adjustments, bonuses, stock awards, stock option grants, perquisites, and other benefits;

> (c)    Review and make recommendations to the Board with respect to the adoption, amendment and termination of the Company's compensation plans, oversee their administration, and discharge any duties imposed on the Compensation Committee by any such plans;

> (d)    Establish and monitor compliance with stock ownership guidelines for directors and executive officers;

> (e)    Review, evaluate, and make recommendations to the Board with respect to the approval of the employment agreements of executive officers;

> (f)    Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement; and

> (g)    Review compliance with and make recommendations to the Board regarding the participation of the CEO in accordance with the FWPP.

72.     Here, the Compensation Committee Defendants completely abdicated their duties in connection with approving defendant McClendon's compensation. The Compensation Committee took only one day to consider and approve the new employment agreement paying McClendon more than $124 million (which McClendon himself proposed). After a single day of consideration of the enormous bonus—a bonus that was totally out of line with prior bonuses paid to McClendon and was being granted in a year in which the Company's value had dropped dramatically—the Compensation Committee recommended the new employment agreement to the Board, which ultimately approved it. The Compensation Committee cannot be said to have acted in good faith by considering an employment agreement amendment of this magnitude for just one day.

73.     Additionally, the Compensation Committee did not consult with any independent consultant, as it is entitled to do pursuant to its Charter. According to Chesapeake's 2008 and 2009 Proxy Statements, the Company "has not utilized any specific tools or contracted for services to benchmark its total compensation, or any material element of compensation, to peer companies or other benchmarks." Again, in the context of a jump in compensation from less than $20 million (in 2006 and 2007) to more than $124 million (2008), in a horrible year for Chesapeake no less, it was incumbent upon the Compensation Committee to obtain an independent analysis as to whether the proposed compensation was in the best interests of the Company. This the Compensation Committee did not do.

74.     The Audit Committee Defendants also breached their fiduciary duties to Chesapeake in recommending that the Company purchase antique maps from defendant McClendon for over $12 million. Pursuant to the Audit Committee's Charter in place during the Relevant Period, its members are responsible for, among other things, "review[ing] insider or affiliated party transactions or courses of dealing."

75.     Here, the Audit Committee Defendants relied only on defendant McClendon's own art agent to value the "over 500 museum quality pieces." They did not seek any independent appraisal of the value of the maps, and there has been no explanation for the utter failure to fulfill their duties. Defendant Kerr, the Chairman of the Audit Committee, is defendant McClendon's cousin.

76.     Continuing the trend by the Board of simply "rubber stamping" the compensation proposed by defendant McClendon to himself, the Compensation Committee did not even discuss the Audit Committee's recommendation that the Company pay $12 million for defendant McClendon's maps.

77.     Finally, on March 1, 2009, Chesapeake amended defendant McClendon's employment agreement again, this time granting McClendon a license to use the Company's properties, plant, and equipment, office facilities, handheld electronic devices,

phone systems, computer systems, computer servers, and e-mail systems for his own and his family members' own personal affairs, legal advice, accounting, taxes, investments, and personal business activities outside of the Company. The amended agreement states that information relating to McClendon's use of such Company property is the exclusive property of McClendon and that the Company waives any ownership of such information. It is not clear what personal interest of McClendon's necessitates this amendment or how the amendment benefits Chesapeake in any way. What is clear is that this further illustrates the Board's acquiescence to McClendon's whims regardless of whether they are in the best interests of Chesapeake.

## Defendants' Purported Justifications for McClendon's Compensation Package Are Unconvincing

78.     Defendants have offered a series of excuses in an attempt to justify defendant McClendon's outlandish compensation, none of which are convincing. First, defendants have claimed that the bonus was designed to deter McClendon from abandoning the Company. There is no evidence that McClendon was even considering leaving Chesapeake in the second year of his new five-year contract. More, after the margin calls in October 2008, McClendon himself stated that he had no intention of jumping ship: "My confidence in Chesapeake remains undiminished, and I look forward to rebuilding my ownership position in the company in the months and years ahead."

79.     Second, defendants have argued that the $75 million bonus was an "incentive" award designed to align defendant McClendon's interests with the interests of Chesapeake and its shareholders. Even assuming the Board's goal was to align McClendon's interests with those of Chesapeake, the Board's efforts would have failed. The FWPP does not properly align McClendon's interests with those of the Company. As an initial matter, structuring the $75 million incentive award to cover McClendon's FWPP bill (essentially providing that the Company fund McClendon's costs) directly contradicted Chesapeake's 2005 proxy representations to shareholders that McClendon

would assume the investment risk by paying his own well costs and, thus, ensure that his interests would be aligned with Chesapeake's interests. The net present value of the gas reserves owned by McClendon also greatly exceeds his average annual compensation, rendering his financial situation more dependent upon the success of his gas wells than the success of the Company itself. Moreover, McClendon's value gained through the FWPP ($191 million) is worth far more than the stock he currently owns in the Company (less than $45 million), further demonstrating an improper alignment of his interests. Finally, defendants' purported "incentive" goal has been contradicted by the Chesapeake admission that the revenue and asset proceeds McClendon received from investing in the FWPP were "personal" in nature and not linked to job performance because the CEO paid his own well costs. As stated in its response letter dated November 7, 2008, to the SEC Staff, Division of Corporation Finance, the Company declared, "[t]he *FWPP is not integrally and directly related to the performance of Mr. McClendon's duties*, and it confers a direct or indirect benefit that has a personal aspect."

80.    Finally, defendants attempt to couch the $75 million bonus as a sort of "reward" for defendant McClendon's efforts in connection with four asset sale transactions occurring in 2008. In addition to such transactions being part of his job, McClendon already stood to benefit directly from the four transactions that he arranged as a result of his financial interest via the FWPP. A $75 million bonus for those efforts was superfluous. Further, there has been no explanation as to how these four asset sale transactions truly benefited Chesapeake in the midst of its atrocious 2008 performance.

### The SEC Has Investigated McClendon's Compensation in Connection with the FWPP

81.    Even before the margin calls and $75 million incentive award, the SEC had expressed concern about defendant McClendon's benefits in connection with the FWPP, and Chesapeake's disclosures related thereto, at least as early as August 2007. In a letter dated August 21, 2007, the SEC recommended, among other things, that Chesapeake

disclose whether the founders' total compensation was significantly higher or lower than income they earned from their participatory working interests granted under the FWPP.

82.    One year later, on August 19, 2008, the SEC sent Chesapeake a letter inquiring as to, among other things, whether the revenues defendant McClendon receives from his FWPP participation constitute "compensation" for purposes of Item 402 of Regulation S-K. Chesapeake responded on September 5, 2008, and agreed to disclose in future annual meeting proxy statements the amounts of oil and natural gas production revenues distributed to McClendon in connection with his FWPP interests. The SEC responded again on October 1, 2008, stating that it was still unclear whether McClendon's revenues from the FWPP should be treated as compensation. In letters dated November 7 and December 2, 2008, Chesapeake informed the SEC that the Company would disclose the present value of future net revenue of the estimated proved developed producing oil and natural gas reserves associated with the FWPP interests owned by McClendon.

83.    Then, after Chesapeake had filed its Form 8-K on January 7, 2009, announcing defendant McClendon's new five-year employment agreement, the SEC sent the Company another letter on January 30, 2009, expressing concerns about the $75 million "incentive award" granted to McClendon. Specifically, the SEC requested that Chesapeake, among other things, explain why the Board determined to enter into a new five-year employment agreement with McClendon with the $75 million bonus at that time and address whether the forced liquidation of his holdings was a factor.   The Company's response included the same purported justifications cited above, and they fail for the same reasons.

**Chesapeake Shareholders Propose Changes to the Company's Compensation Policies, but (Not Surprisingly) the Board Recommends that Shareholders Vote All of the Proposals Down**

84.     In the wake of the outrageous and undeserved compensation showered on defendant McClendon in 2008, Chesapeake shareholders took action, proposing numerous changes to the Company's compensation policies.

85.     The Nathan Cummings Foundation, for example, urged the Chesapeake Board to adopt a policy under which shareholders could vote at each annual meeting on an advisory resolution, to be proposed by Chesapeake's management, to ratify the compensation of the named executive officers set forth in the Proxy Statement's Summary Compensation Table and the accompanying narrative disclosure of material factors provided to understand the Summary Compensation Table ("NCF Proposal"). The proposal submitted to shareholders should make clear that the vote is non-binding and would not affect any compensation paid or awarded to any named executive officer.

86.     Mr. Armstrong, an individual Chesapeake shareholder, similarly proposed that the Board adopt a policy that provides shareholders the opportunity, at each annual meeting, to vote on an advisory resolution, prepared by management, to ratify the compensation of named executive officers listed in the Proxy Statement's Summary Compensation Table and compensation awarded to members of the Board as disclosed in the Proxy Statement ("Armstrong Proposal").

87.     Not surprisingly in light of its track record, the Board recommended a vote "against" all of these proposals.  But rebuking the Board's lavish treatment of McClendon, shareholders voiced approval for both the NCF Proposal and the Armstrong Proposal. Chesapeake shareholders ratified the NCF Proposal, voting 207,881,004 shares in the proposal's favor compared to 163,352,123 shares against it. Shareholders similarly supported the Armstrong Proposal, casting 204,597,656 votes "for" it compared to 163,359,167 actual votes "against" it; but the proposal narrowly failed to pass due to the Company's treatment of abstentions as de facto votes "against."

- 29 -

## INSIDER SELLING

88.     Defendants knew that defendant McClendon was facing margin calls and was going to be forced to sell nearly all of his substantial shares of Chesapeake stock, and they knew the impact that would have on the Company's stock value.    With this knowledge, certain of the defendants sold their personally held shares of Chesapeake stock at artificially inflated prices just days before Chesapeake announced McClendon's sale of 94% of his Chesapeake shares:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| MAXWELL | 10/9/2008 | 450 | $17.23 | $7,753.46 |
| | 10/9/2008 | 1,100 | $17.23 | $18,953.00 |
| | 10/9/2008 | 450 | $17.22 | $7,749.05 |
| | | 2,000 | | $34,455.50 |
| | | | | |
| NICKLES | 10/8/2008 | 5,300 | $22.53 | $119,430.20 |
| | 10/8/2008 | 900 | $22.52 | $20,268.00 |
| | 10/8/2008 | 50 | $22.53 | $1,126.70 |
| | 10/9/2008 | 1,625 | $22.61 | $36,743.85 |
| | 10/9/2008 | 1,500 | $22.92 | $34,380.00 |
| | | 9,375 | | $211,948.75 |
| | | | | |
| WHITTEMORE | 10/6/2008 | 200,000 | $25.09 | $5,017,660.00 |
| | | 200,000 | | $5,017,660.00 |
| | | | | |
| TOTAL: | | 211,375 | | $5,264,064.25 |

89.     As detailed in the chart above, defendant Whittemore, the Chairman of the Compensation Committee, dumped 200,000 shares of his personally held Chesapeake common stock, or 25% of his position, for total proceeds of $5,017,660.   This sale was suspicious in timing and amount.   Whittemore sold 200,000 shares of his Chesapeake common stock on October 6, 2008—four days before the Company announced that defendant McClendon had sold 94% of his Chesapeake stock.

90.    In addition to defendant Whittemore, the stock sales by defendants Nickles and Maxwell were also unusual, as they represented the first ever stock sales for both of those defendants as Chesapeake directors.

## DERIVATIVE ALLEGATIONS

91.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.    Plaintiff brings this action derivatively in the right and for the benefit of Chesapeake to redress injuries suffered, and to be suffered, by Chesapeake as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.    Chesapeake is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93.    Plaintiff will adequately and fairly represent the interests of Chesapeake in enforcing and prosecuting its rights.

94.    Plaintiff was an owner of Chesapeake common stock throughout the Relevant Period and remains a shareholder of the Company.

### Plaintiff's Demand and the Board's Response

95.    On July 24, 2009, Plaintiff sent a letter to the Chesapeake Board expressing his concern over compensation paid to defendant McClendon in 2008 (the "Demand"). Plaintiff detailed the allegations contained herein and demanded that independent members of the Board initiate an investigation to determine whether Chesapeake directors and/or officers breached their fiduciary duties of loyalty, care, and good faith when they awarded McClendon a $75 million incentive award and purchased his art collection for $12.1 million.    Plaintiff further demanded the Board conduct an investigation to determine which Chesapeake directors, officers, employees, or agents, if

any, were responsible for those violations.  Plaintiff also demanded that the Company immediately commence a civil action against McClendon and each of the directors and others to recover the amount of damages sustained as a result of their breaches of fiduciary duties.  Finally, Plaintiff demanded that the Board implement sound corporate governance policies to prevent the recurrence of the acts complained of in the Demand. Plaintiff requested that the Board respond within thirty days from the date of the Demand regarding the Board's proposed course of action with respect to the allegations described herein.  A true and correct copy of the Demand is attached hereto as Exhibit 1.

96.    On August 11, 2009, Jennifer M. Grigsby, Chesapeake Energy's Senior Vice President, Treasurer, and Corporate Secretary, sent a response letter to Plaintiff.  In this correspondence, she stated, among other things, that the Board would address Plaintiff's Demand concerning McClendon's compensation at its next regularly scheduled Board meeting, September 25, 2009.  A true and correct copy of the letter is attached hereto as Exhibit 2.

97.    On November 14, 2009, Ms. Grigsby sent a follow-up letter to Plaintiff.  In this correspondence, Ms. Grigsby informed Plaintiff that the Board and Audit Committee considered Plaintiff's Demand at their September 24, 2009 meetings.  The Board and Audit Committee decided that, in light of a purportedly related litigation concerning McClendon's compensation pending in Oklahoma state court, "the best course of action would be to defer consideration" of Plaintiff's Demand "until the pending litigation becomes more developed."  A true and correct copy of the letter is attached hereto as Exhibit 3.

98.    On January 6, 2010, Plaintiff's counsel and counsel for the Company conferred by telephone.  Counsel for the Company stated that the position articulated in the letter dated November 14, 2009, remained the Company's position as of January 6, 2010.  Although counsel for the Company stated that they would review the prior Demand and Company correspondence, they could not state whether, and did not state

that, the Company's position would be different upon their review. As of the date of the filing of this Complaint, Plaintiff's counsel has not received any further communication from the Company or its counsel.

99.     On April 15, 2010, Ms. Grigsby sent a letter to Plaintiff. In the letter, she stated that the purportedly related state court action was dismissed with leave to amend, but that the plaintiffs instead elected to appeal the dismissal. Ms. Grigsby also stated that the Board and the Audit Committee continue to maintain that it is in the Company's best interest to "defer further action" in response to Plaintiff's Demand pending additional developments in that case. A true and correct copy of the letter is attached hereto as Exhibit 4.

### The Board's Response Was Wrongful

100.    The Board that purportedly considered Plaintiff's Demand consists of the following eight individuals: defendants Davidson, Keating, Maxwell, McClendon, Miller, Nickles, Whittemore, and Hargis. Additionally, defendant Kerr was on the Board at the time the Demand was made on March 20, 2009. However, Kerr retired from the Board effective June 12, 2009. Defendant Whittemore retired from the Board in June of this year.

101.    The Board has not completed an investigation of the allegations contained in the Demand. The Board also does not appear to have interviewed potential witnesses, gathered or reviewed potentially relevant documents, retained outside legal counsel to advise it regarding the Demand, or retained outside consultants to investigate the claims made in the Demand.

102.    The Board has refused, at this time, to even investigate the allegations in Plaintiff's Demand. The Board has also taken the position that it need not conduct any investigation into the allegations in Plaintiff's Demand until some undefined future time. The Board's response indicates that it is taking a neutral position on Plaintiff's Demand.

The Board has neither rejected the Demand, nor indicated that it will pursue any action based on the allegations in the Demand. The Board has simply stated that it will not investigate Plaintiff's allegations at this time. Black letter law regarding corporations dictates that Board neutrality in the face of a demand waives the demand requirement, permitting the shareholder to proceed with the derivative action. The demand requirement here has thus been waived, and this action should proceed.

103.   If demand is not deemed to have been waived here, then the Board's response can only be treated as a tacit refusal of Plaintiff's Demand.

104.   When a Board receives a litigation demand, it must investigate the factual allegations and evaluate the charges raised in the demand to discharge its duty to properly manage corporate affairs. The Board is required to inform itself of all material information reasonably available to it. If the Board fails to engage in these actions, it has wrongfully refused the demand.

105.   Here, the Board is not informing and has not informed itself of all material information reasonably available. On information and belief, the Board has not interviewed a single witness or potential defendant regarding the allegations contained in the Demand. The Board has not retained outside counsel or any consultants to investigate the allegations. Further, the Board has not prepared a report containing the results of its findings or its recommended course of action. The Board has taken none of the many actions that might be anticipated in view of the gravity of the charges. In seeking to abdicate and evade its responsibilities as the managers of the Company, the Board failed to act in good faith, which constitutes wrongful refusal of the Demand.

106.   Moreover, the Board has not even been clear about how long it plans to wait to investigate the matters raised in the Demand, stating only that it will not consider the Demand until the pending litigation "becomes more developed." That nebulous "timeline" provides no assurance that Chesapeake's interests will be protected and is not a proper Board response to a demand.

107.   A stockholder is entitled to know promptly what action the Board will take regarding a litigation demand. Deferral by the Board constitutes "tacit approval" of the shareholder demand and can excuse the demand requirement.   An indefinite postponement of consideration of a shareholder demand is a wrongful refusal, and this case should therefore proceed.

108.   The Board has not filed any lawsuits against those responsible for the misconduct, neither has it attempted to recover for Chesapeake any part of the damages it suffered.  Further delay in the filing of a lawsuit alleging claims against the wrongdoers is unnecessary and would be prejudicial to the Company's rights given concerns regarding the statute of limitations, potential fading of witnesses' memories, and the possible destruction of evidence.  Accordingly, Plaintiff is filing the instant action to preserve the rights of the Company.

## COUNT I

### BREACH OF FIDUCIARY DUTIES AGAINST THE COMPENSATION COMMITTEE DEFENDANTS FOR THEIR ROLES IN DEFENDANT MCCLENDON'S EXCESSIVE COMPENSATION

109.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.   The Compensation Committee Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

111.   Pursuant to the Compensation Committee Charter, the Compensation Committee Defendants had and have the duty to, among other things: (a) review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and set the CEO's compensation level based on this evaluation; (b) review, evaluate, and approve all compensation of directors and executive officers, including salary adjustments, bonuses, stock awards, stock option grants, perquisites, and other benefits; (c) review and make

recommendations to the Board with respect to the adoption, amendment, and termination of the Company's compensation plans, oversee their administration, and discharge any duties imposed on the Compensation Committee by any such plans; (d) establish and monitor compliance with stock ownership guidelines for directors and executive officers; (e) review, evaluate, and make recommendations to the Board with respect to the approval of the employment agreements of executive officers; (f) prepare the report required by the rules of the SEC to be included in the Company's annual Proxy Statement; and (g) review compliance with and make recommendations to the Board regarding the participation of the CEO in accordance with the FWPP.

112.    The Compensation Committee Defendants violated their fiduciary duties of care, loyalty, and good faith by, among other things: (a) approving and recommending to the Board defendant McClendon's $77 million bonus without justification, after only considering it for one day, without retaining a compensation expert, and relying on McClendon's own recommendation; and (b) failing to even discuss the Audit Committee's recommendation that the Company purchase defendant McClendon's personal "antique maps" collection for more than $12 million, notwithstanding the fact that the Audit Committee's decision was without justification, without sufficient explanation, without the retention of an independent appraisal, and relied only on McClendon's own art agent for valuation.

113.    As a direct and proximate result of the Compensation Committee Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

114.    As a result of the misconduct alleged herein, the Compensation Committee Defendants are liable to the Company.

115.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT II

### BREACH OF FIDUCIARY DUTIES AGAINST THE AUDIT COMMITTEE DEFENDANTS FOR THEIR ROLES IN DEFENDANT MCCLENDON'S EXCESSIVE COMPENSATION

116. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117. The Audit Committee Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

118. Pursuant to the Audit Committee Charter, the Audit Committee Defendants are responsible for, among other things, "review[ing] insider or affiliated party transactions or courses of dealing."

119. The Audit Committee Defendants violated their fiduciary duties of care, loyalty, and good faith by, among other things, recommending that the Company purchase McClendon's personal "antique maps" collection for over $12 million. The Audit Committee Defendants relied only on defendant McClendon's own art agent to value the "over 500 museum quality pieces," did not seek any independent appraisal of the value of the maps, and have never explained this utter failure to fulfill their duties.

120. As a direct and proximate result of the Audit Committee Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

121. As a result of the misconduct alleged herein, the Audit Committee Defendants are liable to the Company.

122. Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT III

## BREACH OF FIDUCIARY DUTIES AGAINST THE DIRECTOR DEFENDANTS FOR THEIR ROLES IN DEFENDANT MCCLENDON'S EXCESSIVE COMPENSATION

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

124.    The Director Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

125.    The Director Defendants violated their fiduciary duties of care, loyalty, and good faith by, among other things: (a) approving defendant McClendon's $77 million bonus despite the fact that Chesapeake performed abysmally in 2008, and that the Compensation Committee had only considered the bonus for one day, did not retain a compensation expert, and relied on McClendon's own recommendation; and (b) approving the purchase, on behalf of Chesapeake, of McClendon's personal "antique maps" collection for more than $12 million despite the fact that the Audit Committee did not retain an independent appraisal and relied only on McClendon's own art agent for valuation.

126.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

127.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

128.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT IV

## BREACH OF FIDUCIARY DUTIES AGAINST DEFENDANT MCCLENDON FOR HIS ROLE IN ENSURING EXCESSIVE COMPENSATION TO HIMSELF

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130.    Defendant McClendon owed and owes Chesapeake fiduciary obligations of care, loyalty, and good faith.

131.    As Chesapeake's CEO and Chairman, defendant McClendon had the duty to, among other things, use his best efforts and due diligence to assist the Company in the objective of achieving the most profitable operation of the Company consistent with developing and maintaining a quality business operation.

132.    Defendant McClendon determines his own compensation, pending only approval by the Compensation Committee.  Specifically, defendant McClendon was and is responsible for "analyzing, developing and recommending base salary adjustments, cash bonuses and restricted stock awards with respect to the executive officers, including [himself], for review, discussion and approval by the Compensation Committee at its regularly scheduled meetings in June and December of each year."

133.    Defendant McClendon violated his fiduciary duties of care, loyalty, and good faith by, among other things: (a) recommending and receiving a $77 million bonus to himself in a year in which he was personally responsible for leading Chesapeake to horrible financial results; and (b) recommending and executing the sale to Chesapeake of his personal collection of maps for more than $12 million, notwithstanding the fact that Chesapeake was already in possession of the maps and, thus, the sale effectively provided no benefit to the Company.

134.    As a direct and proximate result of McClendon's failure to perform his fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

135.    As a result of the misconduct alleged herein, defendant McClendon is liable to the Company.

136.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT V

## AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

137. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

138. The Individual Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

139. For the reasons discussed above, the Director Defendants, through their respective actions taken as members of the Board, Compensation Committee, and/or Audit Committee, wasted Chesapeake's corporate assets by, among other things: (a) recommending and/or approving defendant McClendon's $77 million bonus without justification, after only considering it for one day, without retaining a compensation expert, and relying on McClendon's own recommendation; and (b) recommending and/or approving the purchase on behalf of Chesapeake of McClendon's personal "antique maps" collection without justification, without sufficient explanation, and without retaining an independent appraisal and instead relying on McClendon's own art agent; and (c) allowing McClendon to usurp valuable corporate opportunities by fronting the CEO's well costs with the $77 million bonus and artwork purchase.

140. Defendant McClendon also wasted Chesapeake's corporate assets as a result of his primary role in ensuring that the Board approved, and he received, the unjust compensation described above, with no corresponding benefit inuring to the Company.

141. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

142. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

143. Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT VI

## AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

144.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145.    The Individual Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

146.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Chesapeake common stock on the basis of such information.

147.    The information described above was non-public, adverse information concerning defendant McClendon's margin loan calls.  The Insider Selling Defendants used that information for their own benefit when they sold Chesapeake common stock.

148.    The Insider Selling Defendants' sales of Chesapeake common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

149.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

150.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

151.    The Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

152.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT VII

### AGAINST DEFENDANT MCCLENDON FOR UNJUST ENRICHMENT

153.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.   Defendant McClendon owed and owes Chesapeake fiduciary obligations of care, loyalty, and good faith.

155.   By his wrongful acts and omissions, defendant McClendon was unjustly enriched at the expense of and to the detriment of Chesapeake.

156.   As a direct and proximate result of the wrongful acts alleged herein, defendant McClendon was unjustly enriched via, among other things, his amended employment agreement, including the $77 million bonus, and Chesapeake's "purchase" of his antique map collection.

157.   Plaintiff, as a shareholder and representative of Chesapeake, seeks restitution from defendant McClendon and seeks an order of this Court requiring him to disgorge all profits, benefits, and other compensation obtained as a result of his wrongful conduct and fiduciary breaches.

158.   As a direct and proximate result of defendant McClendon's failure to perform his fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

159.   As a result of the misconduct alleged herein, defendant McClendon is liable to the Company.

160.   Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT VIII

### AGAINST DEFENDANTS WHITTEMORE, NICKLES, AND MAXWELL FOR UNJUST ENRICHMENT

161.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.    The Individual Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

163.    By their wrongful acts and omissions, defendants Whittemore, Nickles, and Maxwell were unjustly enriched at the expense of and to the detriment of Chesapeake.

164.    As a direct and proximate result of the insider selling acts alleged herein, defendants Whittemore, Nickels, and Maxwell wrongfully deprived the Company of substantial wealth and were unjustly enriched.

165.    Plaintiff, as a shareholder and representative of Chesapeake, seeks restitution from these defendants, and each of them, and seeks an order of this Court requiring these defendants to disgorge all profits, benefits, and other compensation obtained as a result of their wrongful conduct and fiduciary breaches.

166.    As a direct and proximate result of these defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

167.    As a result of the misconduct alleged herein, these defendants are liable to the Company.

168.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' wrongful conduct described herein;

B.    Awarding to the Company restitution from Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants McClendon, Whittemore, Nickles, and Maxwell as a result of the acts and transactions, including, but not limited to, improper insider selling, complained of herein;

C.     Rescinding defendant McClendon's amended employment agreement, including the $77 million bonus, and the "purchase" of McClendon's personal antique map collection, as a result of the acts and transactions complained of herein;

D.     Directing Chesapeake to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Chesapeake and its shareholders from a repeat of the damaging events described herein;

E.     Extraordinary equitable and/or injunctive relief as permitted by law and equity, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that Plaintiff on behalf of Chesapeake has an effective remedy;

F.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

s/ Kenyatta R. Bethea
Kenyatta R. Bethea, OBA# 18650
HOLLOWAY, BETHEA & OSENBAUGH
3035 N.W. 63rd, Suite 102N
Oklahoma City, OK 73116
Telephone: (405) 246-0600
Facsimile:  (405) 246-0601
kbethea@hbolaw.com

-and-

Brian J. Robbins
George C. Aguilar
Jay N. Razzouk
Lauren N. Ochenduszko
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
**ATTORNEYS FOR PLAINTIFF
M. LEE ARNOLD**

**JURY TRIAL DEMANDED**